UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Sommer Richards,<br><br>  Plaintiff<br><br>v.<br><br>Ondre Wills and Las Vegas Metropolitan Police Department,<br><br>  Defendants | Case No.: 2:19-cv-02043-JAD-BNW<br><br>**Order Granting in Part Motion for Summary Judgment and Closing Case**<br><br>[ECF No. 23] |

Sommer Richards brings this excessive-force suit against the Las Vegas Metropolitan Police Department and one of its officers, Ondre Wills.  The suit arises out of Wills's non-fatal shooting of Richards after reports that Richards was following people through a mobile-home park while threateningly wielding a shovel.  Wills arrived at the scene without backup and repeatedly instructed Richards to put the shovel down, but she ignored those commands.  When Richards—shovel in hand—started advancing toward a bystander, Wills shot her.  Richards survived the shooting and brings an excessive-force claim against Wills and state-law negligence and intentional-infliction-of-emotional-distress claims against both Wills and Metro.  The defendants move for summary judgment on all three claims, arguing that Wills is entitled to qualified immunity.  Because I find that Wills acted reasonably under the totality of the circumstances, he is entitled to qualified immunity on Richards's excessive-force claim.  So I grant Wills summary judgment on it.  I then decline to exercise supplemental jurisdiction over the remaining state-law claims, dismiss them without prejudice to Richards's ability to refile them in state court, and close this case.

**Background**[1]

On the evening of May 12, 2018, Richards "was experiencing an emotional and psychological episode" as she walked barefoot through a mobile-home park while carrying a shovel.[2] Emergency services received calls from two concerned citizens, Maria Montoy (who reported that Richards was threatening her and her family) and Olivia Perez,[3] reporting "that a woman was acting erratically and swinging a shovel in circles."[4] During her 911 call, Perez also reported that Richards had hit Perez's fiancé's car with the shovel and was following the couple through the neighborhood.[5] Officer Wills responded to the calls and arrived at the scene.[6] Body-worn camera (BWC) footage captured the events from Wills's arrival until just before Richards received medical attention.[7]

When Wills exited his vehicle, he immediately drew his firearm and pointed it at Richards, Perez and her fiancé were standing nearby, and Richards was holding a shovel and standing in the street in front of all three of them.[8] Wills immediately ordered Richards to drop

---

[1] These facts are derived from Richards's allegations, depositions, and my observations from the footage recorded by Wills's BWC. ECF No. 23-11 at 3 (CD manually filed at ECF No. 24). *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that courts should rely on video evidence, when possible, to determine reasonableness in excessive-force cases). The facts are undisputed unless otherwise noted.

[2] ECF No. 1 at ¶ 15.

[3] ECF No. 23-5; ECF No. 23-6 (Montoy's and Perez's deposition transcripts).

[4] ECF No. 1 at ¶ 15. There was initially some ambiguity about the object that Richards was carrying, with witnesses identifying it as a broom or a cooking pan, before ultimately concluding it was a shovel.

[5] ECF No. 23-6 at 6–7.

[6] ECF No. 23-11 at 3 (Wills's BWC at 05:20:20).

[7] *Id.*

[8] *Id.*

2

the shovel, but she didn't comply, and Wills told Perez and her fiancé to get behind him.[9] Wills, who arrived on the scene without backup, then communicated over his police radio that "[Richards] is not complying" and requested backup units to respond.[10] Throughout the encounter, Wills told Richards at least 14 times to drop the shovel, but she didn't acknowledge Wills's commands and appeared to be talking to herself.[11] Wills also told Richards to "step back,"[12] said "I don't want to shoot you,"[13] and warned her repeatedly that "if you take one more step, I will shoot you."[14]

About 15 seconds after one such warning, Perez walked around Wills's car and started walking up the sidewalk past Richards, who then pointed at Perez and advanced toward her.[15] Richards then shouted "drop the shovel" one last time, and when Richards didn't comply, Wills fired seven shots, some of which hit Richards, who was standing near the middle of the street.[16] Perez testified in her deposition that she "felt in danger right before [Wills] shot" "because [Richards] had chased [Perez and her fiancé] down the street with a shovel."[17] Wills communicated on his radio that shots had been fired.[18] Richards dropped the shovel and fell to the ground.[19] Wills instructed her to roll over onto her stomach, and Richards complied; she

---

[9] *Id.* (Wills's BWC at 05:20:26).
[10] *Id.* (Wills's BWC at 05:20:36).
[11] *Id.* (Wills's BWC at 05:20:26, 05:20:54, 05:21:08, 05:21:24, 05:21:32).
[12] *Id.* (Wills's BWC at 05:20:48, 05:20:54, 05:21:24).
[13] *Id.* (Wills's BWC at 05:20:48).
[14] *Id.* (Wills's BWC at 05:21:02, 05:21:14).
[15] *Id.* (Wills's BWC at 05:21:29).
[16] *Id.* (Wills's BWC at 05:21:29–05:21:35).
[17] ECF No. 23-6 at 10.
[18] ECF No. 23-11 at 3 (Wills's BWC at 05:21:36).
[19] *Id.*

then rolled onto her back again and remained in that position until she received medical attention.[20] Richards survived the shotting and filed this lawsuit, and I later granted in part the defendants' motion to dismiss, leaving only three claims.[21] The defendants now move for summary judgment on those remaining claims.[22]

## Discussion

### I. Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[23] "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."[24] A fact is material if it could affect the outcome of the case.[25]

On summary judgment, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[26] So the parties' burdens on an issue at trial are critical. When the party moving for summary judgment would bear the burden of proof, "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went

---

[20] *Id.* (Wills's BWC at 05:21:41–05:24:08).
[21] ECF No. 6; ECF No. 16.
[22] ECF No. 23.
[23] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The court's ability to grant summary judgment on certain issues or elements is inherent in FRCP 56. *See* Fed. R. Civ. P. 56(a).
[24] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).
[25] *Id.* at 249.
[26] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

uncontroverted at trial."[27]  If it does, the burden shifts to the nonmoving party, who "must present significant probative evidence tending to support its claim or defense."[28]  But when the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[29]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[30]

## II. Wills is entitled to qualified immunity from Richards's excessive-force claim.

Richards alleges that Wills's use of his firearm constituted excessive force and contends that such force was unnecessary because "Richards did not move aggressively towards anyone prior to Wills shooting Richards" and she "was holding the shovel to the ground and was not an imminent threat to anyone."[31]  Wills counters that he is entitled to qualified immunity for shooting Richards because his actions were objectively reasonable, given that she "ignored his commands" to drop the shovel; he "warned [her] that if she advanced with the shovel, she would be shot; but she "walk[ed] towards [a bystander] with the shovel" anyway.[32]  Richards argues that genuine issues of material fact preclude summary judgment and that the reasonableness of

---

[27] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

[28] *Id.*

[29] *Celotex*, 477 U.S. at 323.

[30] *Id.* at 322.

[31] ECF No. 27 at 6, 20 (Richards's response brief).

[32] ECF No. 23 at 2 (defendants' motion for summary judgment).

Wills's action should be determined by a jury, but she provides minimal binding authority to support her position that Wills isn't entitled to qualified immunity.[33]

### A. Evaluating an officer's entitlement to qualified immunity

Qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[34] Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[35] "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[36] I start with the first prong: whether Wills violated a constitutional right.

### B. There is no genuine dispute that Wills did not violate a constitutional right.

Force is excessive and violates the Fourth Amendment "when it is greater than is reasonable under the circumstances."[37] Courts in the Ninth Circuit "approach an excessive[-]force claim in three stages."[38] First, courts "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted."[39] Then, courts "evaluate the government's interests by assessing the severity of the

---

[33] ECF No. 27 at 3–6, 12–14, 16–21.

[34] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[35] *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (departing from the mandate in *Saucier v. Katz*, 533 U.S. 194, 207 (2001), that the first question must be resolved first)).

[36] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

[37] *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

[38] *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

[39] *Id.* (quoting *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)).

crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape."[40] Finally, courts "balance the gravity of the intrusion on the individual against the government's need for that intrusion."[41]

### 1. Governmental interest in the use of force

Because it is undisputed that Wills used deadly force when shooting his firearm, I need not address the severity-of-the-intrusion part of the analysis and move straight to the governmental interests at stake.[42] "In evaluating the reasonableness of [Wills's] action[s], [I] consider the governmental interests at stake."[43] The governmental interest in the use of force is assessed "by examining three core factors," known as the *Graham* factors, which are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[44] "[T]he most important" of these factors "is whether the suspect posed an immediate threat to the safety of the officers or others."[45] The *Graham* factors "are not exclusive," and courts "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"[46]

---

[40] *Id.*

[41] *Id.* (quoting *Espinosa*, 598 F.3d at 537).

[42] *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (finding that when the type and amount of force are undisputed, "the issue is determining whether the governmental interests at stake were sufficient to justify it"); ECF No. 23 at 16.

[43] *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)).

[44] *Bryan*, 630 F.3d at 826 (citing *Graham*, 490 U.S. at 396).

[45] *Mattos*, 661 F.3d at 441 (cleaned up).

[46] *Id.* (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

7

Wills contends that Richards committed the crime of "assault with a deadly weapon—a felony."[47] And Richards "took an *Alford* plea to [that] charge."[48] Despite her plea, Richards "attempts to minimize the severity of the crime by arguing" that "the most serious crime [she] was committing . . . was failing to obey lawful commands by an officer, a misdemeanor," because the "shovel 'was dragging on the ground'" and wasn't raised.[49] When weighing this factor, courts in the Ninth Circuit examine whether the plaintiff's offense was "inherently dangerous or violent," generally concluding that "[w]hile the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others."[50] But the underlying crime wasn't a misdemeanor; Richards pled to a violent felony. So even viewing this factor in the light most favorable to Richards, I find that it weighs in Wills's favor because Richards pled to felony assault with a deadly weapon and refused to put the shovel down when Wills directed her to do so at least 14 times.

The second and most important *Graham* factor is whether Richards posed a threat to the safety of Wills or others. Wills "has never stated that he fired to protect himself," so the only question is whether Richards posed a threat to Perez, a bystander.[51] A "simple statement by an

---

[47] ECF No. 23 at 16. Wills argues at length that a shovel constitutes a deadly weapon under Nevada law (ECF No. 23 at 16–18), which Richards does not dispute. ECF No. 27. So I assume without deciding that a shovel is a deadly weapon under the functional test of Nevada Revised Statute (NRS) 193.165.

[48] ECF No. 28 at 6 (citing ECF No. 23-2 at 6 (Richards's deposition)) (italics added). *See North Carolina v. Alford*, 400 U.S. 25, 37–39 (1970).

[49] *Id.* (quoting ECF No. 27 at 21–24).

[50] *Bryan*, 630 F.3d at 828–29 (cleaned up).

[51] ECF No. 28 at 7.

officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."[52]

The video of the incident leaves no genuine dispute that Richards posed an objectively dangerous threat to Perez. After Wills ordered Richards to put down the shovel more than a dozen times and warned her that she would be shot if she stepped forward, Richards didn't comply and continued wielding the shovel. She also never responded to Wills's commands or indicated her intent to cooperate. Richards argues that there exists a genuine dispute about how close she was to Perez when Wills fired the shots.[53] She contends that she was "24 feet away," relying on expert Jeffrey Noble's deposition and report, who in turn relied on a Metro-created report.[54] The defendants contend that Metro's report "was based upon the assumption that Perez had remained at the rear of [the] police vehicle" and was created without "the benefit of reviewing the BWC video, Officer Wills['s] statement, or Perez/Amaya's[55] distance estimates" of between six and 10 feet, rather than 24.[56] Wills relies on the "21-foot rule," which originates from law enforcement training manuals and represents that "officers justifiably perceive an imminent threat when a violent or erratically acting suspect, armed with a potentially deadly weapon, gets to within 21[] feet of an officer or citizen."[57]

---

[52] *Mattos*, 661 F.3d at 441–42 (quoting *Deorle*, 272 F.3d at 1281).

[53] ECF No. 27 at 9.

[54] *Id.* (citing ECF No. 23-15 at 11). Noble's report is attached to Richards's response brief. ECF No. 27 at 64–87).

[55] Albert Amaya is Perez's fiancé. ECF No. 23-7 at 5 (Amaya's deposition).

[56] ECF No. 28 at 4, n.4. Wills notes that "[e]veryone present for the shooting testified that [Richards] was within 6-10 feet of Perez at the time of the shooting." *Id.* at 4.

[57] ECF No. 23 at 19 (citing *Estate v. Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 n.1 (10th Cir. 2008); *Chavez v. Las Vegas Metro. Police Dep't*, 2014 WL 374444, at *8 (D. Nev. 2014) (referring to an officer training manual stating that "once an individual [with edged

In *Scott v. Harris*, the Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[58] Regardless of precisely how far Richards was from Perez at the moment of the shooting, it is evident from the video footage that they were within 21 feet of each other, close enough that Richards could quickly reach Perez in a matter of steps. And immediately before the shooting, Richards pointed at Perez and began moving in her direction. In the Ninth Circuit, "[i]f [a] person is armed[,] a furtive movement[,] harrowing gesture, or serious verbal threat might create an immediate threat."[59] Wills concluded that Richards was not complying with any commands, so he acted quickly to protect Perez—whom Richards had already followed earlier in the evening. The BWC footage plainly shows that when Wills shot his firearm, Richards was standing near the middle of the residential street, and Perez was standing on the sidewalk nearby. I therefore find that this factor weighs in Wills's favor.

The third *Graham* factor—actively resisting arrest or attempting to flee—is a close call but ultimately weighs in Richards's favor. Wills contends that Richards "was actively resisting because she ignored all of his lawful commands, refused to drop the deadly weapon, and continued to act in an unpredictable manner."[60] And Wills correctly notes that Richards "does not address this prong" in her response brief.[61] The Ninth Circuit "draw[s] a distinction between

---

weapons, such as knives], gets within 21 feet, the individual poses risk of death or serious physical injury." (cleaned up)); ECF No. 23-9 at 37–38.

[58] *Scott*, 550 U.S. at 380 (finding that the Eleventh Circuit "should have viewed the facts in the light depicted by [a] videotape" instead of the plaintiff's contradictory version of events).

[59] *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

[60] ECF No. 28 at 10.

[61] *Id.*

10

passive and active resistance," and it has observed that resistance "should not be understood as a binary state, with resistance being either completely passive or active. Rather it runs the gamut from the purely passive protester who simply refuses to stand, to the individual who is physically assaulting the officer."[62] The Ninth Circuit urges that courts "must eschew ultimately unhelpful blanket labels" and notes that "[e]ven purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance."[63] "The crux of this *Graham* factor is compliance with officers' request, or refusal to comply."[64]

The Ninth Circuit tends to find that this *Graham* factor tips in the plaintiff's favor and has been reluctant to conclude that even plaintiffs who refused to follow officers' commands but didn't attempt to flee were actively resisting.[65] Although the Ninth Circuit hasn't addressed the active-resistance factor for an armed excessive-force claimant like Richards, its analyses in *Bryan v. MacPherson* and *Smith v. City of Hemet* are instructive. In *Bryan*, the unarmed plaintiff complied with most of the officer's commands—except for one that he claimed not to hear—and didn't attempt to flee.[66] The *Bryan* court found that "his conduct [did] not constitute resistance at all" and if anything, was closer to passive or minor resistance than to active resistance.[67] In *Smith v. City of Hemet*, the plaintiff repeatedly refused to follow the officers' instructions to remove his hands from his pockets and place them on his head, but he didn't attempt to flee,

---

[62] *Bryan*, 630 F.3d at 830 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994); *Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125, 1130–31 (9th Cir. 2002)).

[63] *Id.*

[64] *Mattos*, 661 F.3d at 450.

[65] *See, e.g., id.*; *Bryan*, 630 F.3d at 830; *Smith*, 394 F.3d at 703.

[66] *Bryan*, 630 F.3d at 829–30.

[67] *Id.* at 830.

11

attack the officers, or threaten to attack them.[68] The court concluded that "it does not appear that Smith's resistance was particularly bellicose" and that the third *Graham* factor provided little support for the use of significant force against him.[69]

Both *Bryan* and *Smith* are examples of plaintiffs passively resisting or not resisting at all. Here, Richards behaved similarly and mostly exhibited passive resistance. Richards passively resisted by refusing to comply with Wills's requests to drop the shovel—like in *Smith*—or to verbally respond to them. From the video footage, it does not appear that Richards ever attempted to flee, much like Bryan and Smith. But she did point at Perez and walk toward her while holding the shovel and refusing to drop it, moving the needle closer to active resistance. This latter part of the incident is unlike both *Bryan* and *Smith*, making this factor a closer call in this case. Construing these inferences in the light most favorable to Richards, I find that this factor weighs slightly in her favor. But in their totality, the *Graham* factors weigh in favor of a reasonableness finding.

In his motion, Wills urges me to consider three additional non-*Graham* factors in assessing the reasonableness of his actions: whether less intrusive alternatives were available, whether Wills gave Richards proper warnings, and whether Richards was mentally disturbed (and what effect, if any, that has on the reasonableness of Wills's actions).[70] As Wills points out, Richards's "[o]pposition does not challenge or even address defendants' argument on these

---

[68] *Smith*, 394 F.3d at 703–04.
[69] *Id.* at 703; *see Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091–92 (9th Cir. 2013).
[70] ECF No. 23 at 20–22.

issues,"[71] except briefly concluding that there exists a genuine issue of material fact about whether Wills should have used less-than-lethal force.[72]

As to the first additional factor, Wills notes that he "was alone at the time of the shooting[,] as backup had yet to arrive" and contends that less intrusive alternatives to the firearm weren't available "because an officer facing a suspect with a deadly weapon will never transition to a less-than-lethal option without lethal backup."[73] Wills further reasons that officers without backup won't use less-than-lethal force "because less-lethal options such as a taser can fail, leaving the compromised individual further exposed to the deadly threat."[74] In his deposition, Wills testified that the only non-lethal type of force he considered using was a taser, but he was "afraid that if the [t]aser . . . missed or it hit the shovel, that [he] might have an issue."[75] He also testified that he didn't know when backup would arrive.[76] Richards attempts to argue that whether Wills should have used less-than-lethal force first is a question of fact for a jury to determine.[77] But the person responsible for use-of-deadly-force training at Metro's Police Academy, Chance McLish, testified that Wills's use of deadly force "alone" while "he was confronting a person . . . armed with a dangerous or deadly weapon" was "not unreasonable

---

[71] ECF No. 28 at 10.

[72] *See, e.g.*, ECF No. 27 at 4–5, 7).

[73] ECF No. 23 at 20 (citing ECF No. 23-17 at 39 (deposition transcript of Chance McLish, the "person most knowledgeable regarding use of deadly force training at the [Metro] Police Academy" (cleaned up)).

[74] *Id.* at 21 (citing ECF No. 23-14 at 41–42, 60–61 (Wills's Critical Incident Review Team (CIRT) statement)).

[75] ECF No. 23-9 at 35 (Wills's deposition transcript).

[76] *Id.*

[77] ECF No. 27 at 4–5, 7.

13

and not against [Metro] policy."[78]  So I find that this additional factor weighs in Wills's favor because there was no reasonable less intrusive alternative, given that Richards was armed and not complying when she approached Perez and that Wills didn't know when backup would arrive.

The next additional factor Wills discusses is whether he warned Richards in advance that deadly force would be used.  The BWC footage shows that Wills repeatedly warned Richards that he would shoot her if she didn't stay back, and both Perez and Montoy testified that Wills's commands were clear.[79]  This factor is intertwined with Wills's third and final additional factor—Richards's mental state and its effect on the reasonableness of Wills's actions.  Richards urges me to consider her mental state at the time of the incident, arguing that she didn't comply with Wills's commands to drop the shovel because she didn't understand them.  But Richards was plainly armed with a shovel, and she was repeatedly given warnings about the imminent use of deadly force.  In the Ninth Circuit, "an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation."[80]  Wills clearly warned Richards that she would be shot, and he had his firearm drawn and raised throughout his encounter with Richards.  Wills also warned Richards that "if you take one more step, I will shoot you" at least four times and also said "I don't want to shoot you."[81]

Although Richards apparently posed no risk of flight, she presented an objective, imminent threat to Perez's safety because of her unwillingness to follow instructions and drop

---

[78] ECF No. 23-17 at 39.

[79] ECF No. 23-5 at 7; ECF No. 23-6 at 8.

[80] *Mattos*, 661 F.3d at 451 (citing *Bryan*, 630 F.3d at 831; *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004); *Deorle*, 272 F.3d at 1284; *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)).

[81] ECF No. 23-11 at 3 (Wills's BWC at 05:20:48, 05:21:02, 05:21:14).

the shovel or stay back. So while it is evident that Richards was suffering from mental distress at the time of the incident, she was armed with a shovel, had been repeatedly informed that deadly force could be used against her, and posed an immediate threat to Perez's safety.[82] Though Richards's mental state at the time of the incident factors into my decision, it doesn't outweigh the governmental interest in using force to protect Perez from the threat that Richards posed.

### 2. *Balancing the competing interests*

The final step of the analysis is to "balance the gravity of the intrusion on the individual against the government's need for that intrusion."[83] Two of the three *Graham* factors—including the most important one about imminent danger to others—weigh in Wills's favor, and so do the additional factors discussed *supra*. The intrusion caused by the bullets—deadly force—that struck Richards was "unmatched."[84] The government had a strong interest in using deadly force against Richards because of the threat she posed to Perez and the felony she was in the process of committing: assault with a deadly weapon. I therefore conclude that Wills's use of force was objectively reasonable and not excessive under the circumstances. Because I find that Wills acted reasonably under the totality of the circumstances, I need not reach the second prong of the qualified-immunity analysis: whether the right was clearly established at the time of the challenged conduct.[85]

---

[82] The Ninth Circuit has "refused to create two tracks of excessive[-]force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829. But "even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* (cleaned up).

[83] *Thompson*, 885 F.3d at 586 (quoting *Espinosa*, 598 F.3d at 537).

[84] *Vos*, 892 F.3d at 1031 (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)) ("The intrusiveness of a seizure by means of deadly force is unmatched.").

[85] *Isayeva*, 872 F.3d at 946 (citing *Pearson*, 555 U.S. at 223).

1    In sum, I find that the record shows without genuine dispute that the force that Wills used
2 was not greater than was reasonable under these circumstances.  The BWC footage shows the
3 unvarnished reality of the situation that permits the court to "evaluate[] for objective
4 reasonableness based upon the information the officers had when the conduct occurred"[86] and
5 judge the use of force "from the perspective of a reasonable officer on the scene, rather than with
6 the 20/20 vision of hindsight."[87]  Wills failed to persuade Richards to drop the shovel or stay
7 back and clearly warned her that deadly force would be used if she didn't comply.  Richards then
8 pointed at Perez and began walking toward her, shovel in hand, justifying the Wills's counter use
9 of deadly force.  So because Richards has not shown that Wills violated her constitutional right
10 against excessive force, the qualified-immunity doctrine shields Wills from this suit, and he is
11 entitled to summary judgment in his favor.

### III.  The court declines to exercise supplemental jurisdiction over the remaining state-law claims.

The resolution of Richards's federal claim against Wills leaves only her state-law claims for negligence and intentional infliction of emotional distress (IIED).  Because this lawsuit was brought based on federal-question jurisdiction, this court is exercising supplemental jurisdiction over these state-law claims.  Federal courts are courts of limited jurisdiction, and they maintain supplemental jurisdiction over state-law claims that "are so related to claims in the action" that they form the same case or controversy with the claims over which the court has jurisdiction.[88]  But once a plaintiff's federal claims are gone, the court may decline to exercise supplemental

---

[86] *Cnty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)).

[87] *Id*. (quoting *Graham*, 490 U.S. at 396).

[88] 28 U.S.C. § 1367(a).

jurisdiction over the remaining state-law claims.[89]  Because I grant summary judgment in Wills's favor on Richards's only federal claim, I decline to exercise supplemental jurisdiction over her claims for negligence and IIED, which are based on state law, and dismiss them both without prejudice to Richards's ability to refile them in state court.

## Conclusion

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 23] is GRANTED in part**.  With good cause appearing and no reason to delay, the Clerk of Court is directed to:

- **ENTER PARTIAL FINAL JUDGMENT in favor of Wills on Richards's Fourth Amendment excessive-force claim**, leaving only Richards's state-law claims;

- **DISMISS Richards's claims against Wills and the Las Vegas Metropolitan Police Department for state-law negligence and intentional infliction of emotional distress without prejudice to Richards's ability to refile them in state court; and**

- **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
April 15, 2022

---

[89] *Id.* § 1367(c)(4); *see Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").